**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**NATIONAL CASUALTY COMPANY, a**
**Wisconsin Corporation**

    **Plaintiff,**

                                 **Case No.:**

**vs.**

**UNITED STATES ADULT SOCCER**
**ASSOCIATION, INC. a Tennessee**
**Corporation, MIGUEL MESA, an**
**individual, MIAMI UNITED SOCCER**
**CLUB, LLC, a Florida Limited Liability**
**Company, ROBERTO SACCA, an**
**individual, and RUBEN QUETGLAS, an**
**individual,**

    **Defendants.**

_____/

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, National Casualty Company ("National Casualty"), hereby sues defendants, United States Adult Soccer Association, Inc. ("USASA"), Miguel Mesa, Miami United Soccer Club, LLC ("Miami United"), Roberto Sacca, and Ruben Quetglas, and seeks a declaratory judgment pursuant to 28 U.S.C. §2201 and Rule 57 of the Federal Rules of Civil Procedure for purposes of determining a question of actual controversy between the parties.

## PARTIES

1.      At all pertinent times, National Casualty was, and still is, a corporation organized and existing under the laws of the State of Wisconsin with its principal place of business in Scottsdale, Arizona.

1

2.      At all pertinent times, USASA was, and still is, a Tennessee corporation with its principal place of business in Bridgeview, Illinois.

3.      Upon information and belief, at all pertinent times, Miguel Mesa was, and still is, a resident of Miami, Florida.

4.      At all pertinent times, Miami United was, and still is, a Florida Limited Liability Company with its principal place of business in Miami Beach, Florida.  According to the Florida Department of State Division of Corporations, at all pertinent times Roberto Sacca was, and still is, the sole member of Miami United, and a resident of Miami Beach, Florida.

5.      Upon information and belief, at all pertinent times, Roberto Sacca was, and still is, a resident of Miami Beach, Florida.

6.      Upon information and belief, at all pertinent times, Ruben Quetglas was, and still is, a resident of Miami, Florida.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §1332 because there is diversity of citizenship among the parties and the matter in controversy exceeds the sum of $75,000, exclusive of interest, attorneys' fees and costs.

8.      Venue is proper in the United States District Court for the Southern District of Florida, because the incident that is the subject matter of this lawsuit is alleged to have occurred in Miami, Florida, which is within the jurisdiction of this Court.

## NATURE OF THE CLAIM

9.      This is an action for declaratory judgment, pursuant to 28 U.S.C. §2201 and Rule 57 of the Federal Rules of Civil Procedure, to determine an actual case or controversy

PD.18225341.1

between the parties and their respective rights and obligations with respect to certain insurance policies issued by National Casualty.

10.     National Casualty seeks a judgment declaring that it has no obligation under certain insurance policies to defend or indemnify USASA, Miami United, Mr. Mesa, Mr. Sacca, or any other party in connection with the lawsuit described below ("Underlying Lawsuit").

## FACTUAL BACKGROUND

11.     On July 16, 2015, Mr. Quetglas filed a lawsuit captioned *Ruben Arturo Quetglas v. Miami United Soccer Club, LLC, United States Adult Soccer Association, Roberto Sacca, and Miguel Mesa*, case no. 15-016185-CA-01 in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida (the "Underlying Lawsuit").

12.     On September 22, 2015, Mr. Quetglas filed an Amended Complaint in the Underlying Lawsuit.  A true and correct copy of the Amended Complaint filed in the Underlying Lawsuit is attached hereto as **Exhibit "A."**

13.     Mr. Quetglas alleges that USASA is the premier national organization and sanctioning body for adult amateur soccer in the United States.  USASA allegedly consists of approximately 54 state organizations along with regional and national leagues.  (Ex. A, ¶ 4)

14.     Mr. Quetglas also alleges that Miami United owned, managed, and/or organized Miami United Football Club ("MUFC"), a premier, semi-professional soccer team based in Miami, Florida.  MUFC is allegedly a member of the USASA's National Premier Soccer League, and is allegedlydirectly run by, and affiliated with, the USASA which sanctions/manages the teams tryouts, games and practices.  (Ex. A, ¶¶ 3-4)

15.     Mr. Sacca is alleged to be the owner of Miami United and MUFC.  He is alleged to have participated in the recruitment of players for the MUFC, coordinated team events an

PD.18225341.1

games, and selected and/or hired coaches and other support staff to manage MUFC.  All of the acts by Mr. Sacca complained of by Mr. Quetglas were allegedly committed within the course and scope of Mr. Sacca's position with Miami United and USASA.  (Ex. A, ¶ 5)

16.    Mr. Mesa is alleged to be the coach and/or team manager of MUFC, employed by and/or contracted with Miami United and/or USASA.  Mr. Quetglas alleges that Mr. Mesa had the responsibility to manage, supervise, and monitor the team's tryouts, practices and games, take all reasonable measures to protect the health and safety of the team's tryout candidates and its official players.  All of the acts by Mr. Mesa complained of by Mr. Quetlas were allegedly committed within the course and scope of Mr. Mesa's position with Miami United and/or USASA.  (Ex. A, ¶ 6)

17.    Mr. Quetglas alleges that in December 2013, USASA held, sponsored, oversaw and/or managed tryouts for the Miami United soccer team at Milander Park in Hialeah, Florida. (Ex. A, ¶ 16)

18.    Mr. Quetglas asserts that he participated in the tryouts as a goalie.  Mr. Sacca advised him that he made the adult men's teams and that he should return for the team's first official practice on January 7, 2014.  (Ex. A, ¶ 16)

19.    Mr. Quetglas alleges that he participated in the January 7, 2014 practice without being required to submit to a physical examination to assess his fitness for participation in the league's practice or games.  He claims that he suffered from a pre-existing condition which substantially contributed to his alleged injury, and could have been discovered through a thorough pre-participation health screening.  (Ex. A, ¶17)

20.    Mr. Quetglas alleges there was no supervision or oversight by any coaching staff during these drills.  Nor were any managers or trainers present to ensure reasonable participant

conduct and/or to guard against the violation of safety protocols during practice which might pose a threat to Mr. Quetglas.  (Ex. A, ¶ 18)

21.     It is also alleged by Mr. Quetglas that there were no effective emergency protocols or staffing in place at this practice to ensure proper care and management of participant injuries, should they occur.  (Ex. A, ¶ 18)

22.     Mr. Quetglas alleges that on January 7, 2014, at the team's first official practice, he was placed in a defensive posture against veteran members of the team, despite having no experience playing soccer in a premier league against professional-level players.  One of these players was allegedly Juan Sebastian Alfonso, who was known to be a fierce player with aggressive propensities.  (Ex. A, ¶ 18)

23.     Mr. Quetglas claims that Mr. Sacca "specifically solicited and/or recruited Juan Sebastian Alfonso to join the MUFC because of his aggressive tendencies and reputation for vicious tactics against other players during games."  Mr. Sacca also allegedly encouraged and rewarded such conduct by Alfonso, which at times resulted in injuries to other players.  (Ex. A, ¶ 19)

24.     Mr. Quetglas alleges that during the first drills on January 7, 2014, he jumped up to block a ball.  While he was in the air, Juan Sebastian Alfonso charged and "side-tackled, impacted and/or collided" with Mr. Quetglas with sufficient force to flip him upside down.  Mr. Quetglas claims he crashed to the turf, landing on his neck.  (Ex. A, ¶ 20)

25.     Mr. Quetglas further alleges that, contrary to appropriate safety practices for potential head and spinal injury, he was improperly moved and/or repositioned before emergency first responders arrived.  (Ex. A, ¶ 20)

26.      Mr. Quetglas alleges that, as a result of the collision and subsequent movement prior to the arrival of paramedics, he suffered "debilitating injuries to his cervical spine resulting in incomplete quadriplegia." (Ex. A, ¶ 21)

27.      Mr. Quetglas asserts claims for negligence against USASA, Miami United, Mr. Sacca, and Mr. Mesa. (Ex. A, ¶¶ 23-38)  He also alleges that Miami United, and, alternatively, USASA, are vicariously liable for the negligence of Mr. Sacca and Mr. Mesa.  (Ex. A, ¶¶ 39-48)

28.      Mr. Quetglas alleges that USASA had a duty to exercise reasonable care to protect the health and safety of players on teams within its league, and to implement rules, policies and regulations for its member clubs to follow in an attempt to best protect its participants, particularly when known and foreseeable risks existed that pose a threat to the safety of its players.  (Ex. A, ¶ 28)

29.      In his Amended Complaint, Mr. Quetglas alleges that USASA breached its duty of care to him by the following facts and/or omissions:

a)      Failure to train and educate its coaching staff to properly regulate and monitor practices, drills, tryouts and other team events so as to protect newer participants from known risks such as veteran players with a history of aggression and violence;

b)      Failure to institute acclimation procedures to ensure acclimation and adjustment of the new team members to potential hazards of play before they participate in USASA sponsored practices or games with veteran team members;

c)      Failure to develop and/or employ policies, procedures and/or protocols of warning and counseling existing team members about the use of excessive violence and aggression against new, "rookie" players during routine, non-competitive practices and drills;

d)      Failure to ensure that a physical examination and history was taken of Plaintiff prior to participation in practice in order to ensure that he was fit for play and not medically-compromised or susceptible to injury due to pre-existing injury or trauma;

e)      Failure to demand and ensure the presence and attention of its coaching staff during all organized practices, including warm-up drills;

f)      Failure to create effective, internal controls and penalties for Miami United team members who repeatedly deviated from appropriate standards of safety, care and caution during games or practices;

g)      Failure to ensure that incoming "rookie" players were forewarned of potential hazards of which the USASA staff has greater knowledge such as dangerous players with a proclivity for violent play;

h)      Failure to create and implement effective league-wide guidelines or policies to protect the safety of its participants, and particularly new players who are likely unfamiliar with the propensities and background of other team members;

i)      Failure to develop, implement and train its staff on appropriate emergency protocols in the event of participant injury, and in particular, the proper procedures to follow in the event of potential head or spinal injury so as to avoid aggravation of injury through premature movement of a player when the nature and extent of injury is unknown; and,

j)      Failure to protect the safety and health of its players.  (Ex. A, ¶ 29(a)-(j))

30.     As a result of USASA's alleged negligence, Mr. Quetglas claims he suffered significant and permanent injuries, including bodily injury, resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of medical and therapeutic care, and loss of ability to earn money.  (Ex. A, ¶ 30)

31.     Mr. Quetglas alleges that Miami United had a duty to exercise reasonable care in its management of MUFC, and to protect the health and safety of its players by implementing rules, regulations and policies in an attempt to best protect its participants, particularly when known and foreseeable risks exist posing a threat to the safety of its players.  (Ex. A, ¶ 24)

32.     In his Amended Complaint, Mr. Quetglas alleges that Miami United breached its duty of care to him by the following acts and/or omissions:

a)      Failure to train and educate its coaching staff to properly regulate and monitor practices, drills, tryouts and other team events so as to protect newer participants from known risks such as veteran players with a history of aggression and violence;

7

b)      Failure to institute acclimation procedures to ensure acclimation and adjustment of the new team members to potential hazards of play before they participate in USASA sponsored practices or games with veteran team members;

c)      Failure to develop and/or employ policies, procedures and/or protocols of warning and counseling existing team members about the use of excessive violence and aggression against new, "rookie" players during routine, non-competitive practices and drills;

d)      Failure to ensure that a physical examination and history was taken of Plaintiff prior to participation in practice in order to ensure that he was fit for play and not medically-compromised or susceptible to injury due to pre-existing injury or trauma;

e)      Failure to demand and ensure the presence and attention of its coaching staff during all organized practices, including warm-up drills;

f)      Failure to create effective, internal controls and penalties for Miami United team members who repeatedly deviated from appropriate standards of safety, care and caution during games or practices;

g)      Failure to ensure that incoming "rookie" players were forewarned of potential hazards of which the USASA staff has greater knowledge such as dangerous players with a proclivity for violent play;

h)      Failure to create and implement effective league-wide guidelines or policies to protect the safety of its participants, and particularly new players who are likely unfamiliar with the propensities and background of other team members;

ii)     Failure to develop, implement and train its staff on appropriate emergency protocols in the event of participant injury, and in particular, the proper procedures to follow in the event of potential head or spinal injury so as to avoid aggravation of injury through premature movement of a player when the nature and extent of injury is unknown; and,

j)      Failure to protect the safety and health of its players.  (Ex. A, ¶ 25(a)-(j))

33.     As a result of Miami United's alleged negligence, Mr. Quetglas claims he suffered significant and permanent injuries, including bodily injury, resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of medical and therapeutic care, and loss of ability to earn money.  (Ex. A, ¶ 26)

8

34.     Mr. Quetglas alleges that Mr. Sacca had a duty to exercise reasonable care in the organization, management and supervision of the MUFC, to protect the health and safety of the players, and to refrain from any conduct which posed a foreseeable threat to members of his soccer team, including Mr. Quetglas.  (Ex. A, ¶ 32)

35.     In his Amended Complaint, Mr. Quetglas alleges that Mr. Sacca breached his duty of care to him by the following acts and/or omissions:

a)      Deliberately recruiting players with aggressive/dangerous propensities for violent play which would pose a risk of harm to members of his own team, including Plaintiff;

b)      Failing to properly regulate and monitor practices, drills, tryouts and other team events so as to protect newer participants from known risks such as players with a history of aggression and violence;

c)      Encouraging the use of excessive violence and aggression by players, particularly in a setting with new, "rookie" participants during routine, non-competitive practices and drills;

d)      Failing to ensure that a physical examination and history was taken of incoming team members, including Plaintiff, prior to participation in practice in order to determine that they are fit for play and not medically-compromised or susceptible to injury due to some pre-existing injury or trauma;

e)      Failure to be present and attentive during organized practices, including warm-up drills, to prevent the foreseeable risk of harm associated with unmonitored play;

f)      Failure to penalize or impose consequences upon participants who repeatedly deviated from appropriate standards of safety, care and caution during games or practices;

g)      Failure to warn incoming "rookie" players, like the Plaintiff, of potential hazards of which Mr. Sacca had greater knowledge such as dangerous players with a proclivity for violent play, such as Alfonso; and,

h)      Failure to protect the safety and health of its players.  (Ex. A, ¶ 33(a)-(h))

36.     As a result of Mr. Sacca's alleged negligence, Mr. Quetglas claims he suffered significant and permanent injuries, including bodily injury, resulting pain and suffering,

disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of medical and therapeutic care, and loss of ability to earn money.  (Ex. A, ¶ 34)

37.     Mr. Quetglas alleges that Mr. Mesa had a duty to exercise reasonable care in the performance of his coaching, management and supervisorial duties with Miami United and/or USASA, and to protect the health and safety of the players of the MUFC which whose oversight he was charged with, including Mr. Quetglas.  (Ex. A, ¶ 36)

38.     In his Amended Complaint, Mr. Quetglas alleges that Mr. Mesa breached his duty of care to him by the following acts and/or omissions:

a)      Failure to properly regulate and monitor practices, drills, tryouts and other team events so as to protect newer participants from known risks such as veteran players with a history of aggression and violence;

b)      Failure to employ acclimation procedures so as to ensure acclimation and adjustment of the new team members to potential hazards of play before they participate in USASA sponsored practices or games with veteran team members;

c)      Failure to warn and counsel existing team members about the use of excessive violence and aggression against new, "rookie" players during routine, non-competitive practices and drills;

d)      Failure to ensure that a physical examination and history was taken of incoming team members, including Plaintiff, prior to participation in practice in order to determine that they are fit for play and not medically-compromised or susceptible to injury due to some pre-existing injury or trauma;

e)      Failure to be present and attentive during organized practices, including warm-up drills, to prevent the foreseeable risk of harm associated with unmonitored play;

f)      Failure to penalize or impose consequences upon participants who repeatedly deviate from appropriate standards of safety, care and caution during games or practices;

g)      Failure to warn incoming "rookie" players, like the Plaintiff, of potential hazards of which the Mr. Mesa had greater knowledge such as dangerous players with a proclivity for violent play, such as Alfonso;

h)      Failure to effectively coach and manage practices to minimize the risk of injury to participants;

i)      Failure to follow appropriate emergency protocols in the event of participant injury, and in particular, the proper procedures to follow in the event of potential head or spinal injury so as to avoid aggravation of injury through premature movement of a player when the nature and extent of injury is unknown; and,

j)      Failure to protect the safety and health of its players.  (Ex. A, ¶ 37(a)-(j))

39.     As a result of Mr. Mesa's alleged negligence, Mr. Quetglas claims he suffered significant and permanent injuries, including bodily injury, resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of medical and therapeutic care, and loss of ability to earn money.  (Ex. A, ¶ 38)

40.     Prior to the alleged accident, National Casualty, working closely with USASA, had previously approved a waiver form to be used by all USASA affiliate teams.

41.     The waiver form signed by Mr. Quetglas is not the waiver form that had been previously approved by National Casualty.

## THE POLICIES

42.     National Casualty issued Policy No. KRO0000003704700 (the "Primary Policy") to United States Adult Soccer Association and its affiliates, leagues and teams for the period of September 1, 2013 to September 1, 2014. A certified copy of the Primary Policy is attached hereto as **Exhibit "B."**

43.     National Casualty also issued Excess Policy No. XKO0000003704800 (the "Excess Policy") to United States Adult Soccer Association and its affiliates, leagues and teams for the period of September 1, 2013 to September 1, 2014. A certified copy of the Excess Policy is attached hereto as **Exhibit "C."**

44.     Pursuant to the Primary Policy's Insuring Agreement of Coverage A – Bodily Injury and Property Damage Liability, National Casualty agrees to "pay those sums that the

insured becomes legally obligated to pay as damages because of 'bodily injury' ... caused by an 'occurrence,'" provided that the "bodily injury" occurs during the policy period.  (Ex. B, CG 00 01 04 13)

45.     The Insuring Agreement further requires that the "bodily injury" be caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (*Id.*)

46.     The Primary Policy contains an endorsement entitled "Legal Liability to Participants" ("LLP Endorsement").  The LLP Endorsement amends Coverage A - Bodily Injury and Property Damage Liability of the CGL coverage form to include an exclusion which provides that Coverage A of the Policy does not apply to "bodily injury" to a "participant."  (Ex. B, KR-GL-1-IL)

47.     The LLP Endorsement defines "participant" as "'player', coaches, managers, staff members, team workers, referees, officials, scorekeepers, all other personnel including but not limited to, media personnel permitted to enter any 'restricted areas' which are defined as those areas restricting access to general public spectators."  (*Id.*)

48.     "Players" are defined in the LLP Endorsement as "amateur soccer players." "Restricted areas" are defined in the LLP Endorsement as "areas which are occupied by athletes and to which access by the general public is restricted or prohibited."  (*Id.*)

49.     The LLP Endorsement includes a waiver condition which states as follows:

   a.   You must obtain from each "player" a valid waiver and release form approved by us and signed by each "player" prior to the "covered activities".

   However, this condition does not apply if:

      1.     You require each "player" to sign a waiver and release form previously approved by us prior to the "covered activities".

PD.18225341.1

2.      Your failure to obtain the waiver and release approved by us was an isolated incident or due to misrepresentation or fraud by the "player". (*Id.*)

50.     The LLP Endorsement also includes a condition which states as follows:

You must see to it that "participant accident insurance" is in force and effect for each "player" at the time of occurrence giving rise to a claim or "suit" under this policy.  If "participant accident insurance" is not in force and effect for each "player" at the time of occurrence giving rise to a claim or "suit" under this policy the limit for Legal Liability to Participants is reduced to $500,000. (*Id.*)

51.     The LLP Endorsement defines "participant accident insurance" as "an insurance contract which provides medical expense coverage in the amount of at least $2,500 to each 'player' for injury incurred during 'covered activities.'"  (*Id.*)

52.     The Excess Policy is subject to an Underlying Sublimit Coverage Exclusion Endorsement which provides that the Excess Policy does not apply to an "'event' covered in the 'controlling underlying insurance' unless the 'controlling underlying insurance' limit for 'injury or damage' is at least equal to the Applicable Limits as shown on the Schedule of Controlling Underlying Insurance."  (Ex. C, XL-2322)

53.     The Excess Policy defines an "event" as "an 'occurrence,' offense, accident, act, or other event, to which the applicable 'controlling underlying insurance' applies."  "Controlling underlying insurance" is defined as "any policy of insurance or self-insurance listed in the Declarations under the Schedule of 'controlling underlying insurance.'"  (Ex. C, CX 00 01 09 08)

54.     The Schedule of Controlling Underlying Insurance under the Excess Policy lists the Primary Policy as providing Commercial General Liability coverage.  (Ex. C, XL-SP-1)  The

13

term "injury or damage" means "any injury or damage, covered in the applicable 'controlling underlying insurance' arising from an 'event.'"  (Ex. C, CX 00 01 09 08)

      55.    The applicable limits shown on the Excess Policy's Schedule of Controlling Underlying Insurance is $2,000,000 for Each Occurrence; $2,000,000 for Personal and Advertising Injury; and $3,000,000 for Products/Completed Operations Aggregate.  (Ex. C, XL-SP-1)

      56.    The Excess Policy's Insuring Agreement of Section I – Coverages provides:

> b.    This insurance applies to "injury or damage" that is subject to an applicable "retained limit".  If any other limit, such as, a sublimit, is specified in the "controlling underlying insurance", this insurance does not apply to "injury or damage" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of "controlling underlying insurance".  (Ex. C, CX 00 01 09 08)

      57.    The Excess Policy defines "retained limit" as "the available limits of 'controlling underlying insurance' applicable to the claim."  (*Id*.)

## DECLARATORY RELIEF

      58.    National Casualty adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as though completely and fully set forth herein.

      59.    An actual, present and existing controversy has arisen between National Casualty, USASA and Mr. Quetglas with respect to the National Casualty's obligations under the Primary policy and the Excess Policy in connection with the Underlying Lawsuit.

      60.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§2201-2202, National Casualty seeks a judicial declaration of its rights and duties to USASA, if any, under the Primary Policy and Excess Policy relative to the claims asserted in the Underlying Lawsuit.  The Court's making such a declaration will confer certainty on the parties with respect to their rights and

14

obligations under the Primary Policy and Excess Policy, and will therefore serve the interests of justice.

61.     The LLP Endorsement contained in the Primary Policy defines "participant" as a "'player' ... permitted to enter any 'restricted areas' which are defined as those areas restricting access to general public spectators."  (Ex. B, KR-GL-1-IL)

62.     "Players" are defined in the LLP Endorsement as "amateur soccer players." "Restricted areas" are defined in the LLP Endorsement as "areas which are occupied by athletes and to which access by the general public is restricted or prohibited."  (*Id.*)

63.     Based upon information available  to National Casualty, Mr. Quetglas qualifies as a "player" under the Primary Policy.

64.     Based upon information available to National Casualty, Mr. Quetglas also qualifies as personnel permitted to enter a "restricted area" as defined in the Primary Policy.

65.     Accordingly, Mr. Quetglas qualifies as a "participant" under the Primary Policy. Therefore, the Primary Policy's participants exclusion bars coverage for this claim under Coverage A - Bodily Injury and Property Damage Liability of the CGL coverage form.

66.     The LLP Endorsement amends the CGL coverage form to provide an additional coverage grant, entitled "Section I – Coverages: Coverage – Liability to 'Participants.'" Pursuant to that Insuring Agreement, National Casualty agrees to "pay those sums that the Insured becomes legally obligated to pay as damages because of 'bodily injury' to any 'participant' to which this insurance applies."  (Ex. B, KR-GL-1-IL)

67.     However, the LLP Endorsement has a condition (the "waiver condition") which states, "You must obtain from each 'player' a valid waiver and release form approved by us and signed by each 'player' prior to the 'covered activities.'" *Id.*

68.     National Casualty worked extensively with USASA regarding the waiver and release form that was to be utilized by USASA and its affiliates, leagues and teams.

69.     However, the Waiver Agreement signed by Mr. Quetglas is not the waiver and release form approved by National Casualty.

70.     The waiver condition does not apply if "[y]ou require each 'player' to sign a waiver and release form previously approved by us prior to the 'covered activities'" and/or "[y]our failure to obtain the waiver and release approved by us was an isolated incident or due to misrepresentation or fraud by the 'player.'" (Ex. B, KR-GL-1-IL)

71.     The waiver form signed by Mr. Quetglas was not previously approved by National Casualty, and based upon information available to National Casualty, the failure to obtain a waiver and release approved by National Casualty was not an "isolated incident" or due to misrepresentation or fraud by Mr. Quetglas.

72.     Therefore, the waiver condition in the LLP Endorsement was not satisfied, thereby precluding coverage under the endorsement for Mr. Quetglas's claim.

73.     The LLP Endorsement also includes a participant accident insurance condition, which states as follows:

> You must see to it that "participant accident insurance" is in force and effect for each "player" at the time of occurrence giving rise to a claim or "suit" under this policy.  If "participant accident insurance" is not in force and effect for each "player" at the time of occurrence giving rise to a claim or "suit" under this policy the limit for Legal Liability to Participants is reduced to $500,000.  (Ex. B, KR-GL-1-IL)

74.     USASA was notified of this loss by Miami United.

16

75.     National Casualty understands that USASA did not tender the claim to the participant accident insurance carrier because Mr. Quetglas does not qualify for coverage under the participant accident insurance.

76.     Thus, "participant accident insurance" was not in force and effect for Mr. Quetglas at the time of the occurrence give rising to this claim under the Primary Policy.

77.     Based on available information, the participant accident insurance condition was not satisfied.

78.     Therefore, in the event Legal Liability to Participants coverage is available for the claim, the limit of liability for this coverage is reduced from $2,000,000 to $500,000.

79.     The Excess Policy is a follow form policy.   Thus, the above exclusions, provisions and conditions of the Primary Policy available to National Casualty are equally applicable as they relate to coverage for the claim under the Excess Policy.

80.     The Excess Policy is subject to an Underlying Sublimit Coverage Exclusion Endorsement which provides that the Excess Policy does not apply to an "'event' covered in the 'controlling underlying insurance' unless the 'controlling underlying insurance' limit for 'injury or damage' is at least equal to the Applicable Limits as shown on the Schedule of Controlling Underlying Insurance."  (Ex. C, XL-2322)

81.     The Excess Policy defines an "event" as "an 'occurrence', offense, accident, act, or other event, to which the applicable 'controlling underlying insurance' applies."  "Controlling underlying insurance" is defined as "any policy of insurance or self-insurance listed in the Declarations under the Schedule of 'controlling underlying insurance'".  (Ex. C, CX 00 01 09 08)

82.     The Schedule of Controlling Underlying Insurance under the Excess Policy lists the Primary Policy as providing Commercial General Liability coverage.  The term "injury or damage" means "any injury or damage, covered in the applicable 'controlling underlying insurance' arising from an 'event.'"  (Ex. C, XL-SP-1)

83.     The applicable limits shown on the Excess Policy's Schedule of Controlling Underlying Insurance is $2,000,000 for Each Occurrence; $2,000,000 for Personal and Advertising Injury; and $3,000,000 for Products/Completed Operations Aggregate.  (*Id.*)

84.     In the event the limit under the Legal Liability to Participants coverage is reduced to $500,000, the claim is considered an "event" covered in the "controlling underlying insurance" and satisfies the "occurrence" requirement in the excess policy.

85.     However, the $500,000 limit available under the Legal Liability to Participants coverage would not be "at least equal to the Applicable Limits as shown on the Schedule of Controlling Underlying Insurance," *i.e.* $2,000,000 for Each Occurrence; $2,000,000 for Personal and Advertising Injury; and $3,000,000 for Products/Completed Operations Aggregate.

86.     Further, the Excess Policy's Insuring Agreement of Section I – Coverages provides in relevant part as follows:

> b.   This insurance applies to "injury or damage" that is subject to an applicable "retained limit".  If any other limit, such as, a sublimit, is specified in the "controlling underlying insurance", this insurance does not apply to "injury or damage" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of "controlling underlying insurance."  (Ex. C, CX 00 01 09 08)

87.     The Excess Policy defines "retained limit" as "the available limits of 'controlling underlying insurance' applicable to the claim."  (*Id.*)

88.     Thus, because the Schedule of Controlling Underlying Insurance does not specify the $500,000 reduced limit (nor does the declaration of the Excess Policy), the Excess Policy

does not provide coverage for the claim in the event the limit under the Legal Liability to Participants coverage is reduced to $500,000.

89.     In addition to the foregoing provisions, National Casualty pleads all other conditions, terms, warranties, limits, definitions and exclusions of the Primary Policy and the Excess Policy which also may be found to be applicable as investigation of this claim continues, and National Casualty reserves the right to amend its Complaint for Declaratory Judgment as additional and/or more specific information becomes available.

WHEREFORE, National Casualty respectfully requests that this Court enter a judgment declaring the rights, status and obligations of the parties under the Primary Policy and the Excess Policy, specifically that National Casualty has no obligation under the terms of the Primary Policy or the Excess Policy to defend or indemnify USASA, Mr. Mesa, Miami United, Mr. Saca, or any other entity or individual in connection with the Underlying Lawsuit.

**PHELPS DUNBAR LLP**

*/s/* Patricia A. McLean
PATRICIA A. MCLEAN, ESQ.
Florida Bar No. 0129143
patricia.mclean@phelps.com
JUSTIN N. SHINDORE, ESQ.
Florida Bar No. 85396
justin.shindore@phelps.com
JONATHAN E. LEWERENZ, ESQ.
Florida Bar No. 0084432
PHELPS DUNBAR LLP
100 South Ashley Drive, Suite 1900
Tampa, FL 33602
Telephone No.: (813) 472-7550
Facsimile No.: (813) 472-7570

**ATTORNEYS FOR PLAINTIFF, NATIONAL CASUALTY COMPANY**

PD.18225341.1